[No. 30814. *En Banc.* October 10, 1949.]

WALTER J. REINEMANN *et al.*, *Appellants*, v. RALPH ANDERSON *et al.*, *Respondents.*[1]

SIMPSON, C. J., HILL, and DONWORTH, JJ., dissent.

*G. Robert Huston,* for appellants.

*Elery A. Van Diest* and *Grady & Grady,* for respondents.

ROBINSON, J.—The decision to be made on this appeal will directly depend upon the interpretation of three lines of a

[1] Reported in 210 P. (2d) 394.

written contract. The plaintiff, Paul Reinemann Company, a New York limited partnership, has long been engaged in purchasing hops from growers and selling them to brewers. The defendants are growers of hops in Yakima county, Washington. A great many hops are grown in the Yakima valley. In June, 1947, Mr. Orin E. "Babe" Hollingbery was acting as an independent hop broker in Yakima. On June 21st of that year, he wrote to the plaintiff partnership stating that he was so engaged, and that he had done business for a number of New York hop buyers; and further said:

"I rustle the grower for the dealers needs, write and sign the contracts, stay on top of the operation, take in the crop and do everything necessary to represent the dealer. . . . Would you be interested in having me do some work for you in the valley along this line?

"And would you be interested to buy from a reliable grower on a 2nd, 150 bales of seedless 1947 crop, 6% L & S, content with a 1¢ premium for each percent under 6%. Price 53¢ per lb. I have this option for a few days."

The words "on a 2nd" in the above paragraph are, in our opinion, of great utility in solving the problem presented by this appeal.

Mr. F. S. Herman, a member of the plaintiff partnership, testified that, upon receipt of the Hollingbery letter, Mr. Walter Reinemann called Mr. Hollingbery on the telephone, and that he (the witness) listened to their conversation on the office intercommunicating system. Herman testified that Mr. Reinemann told Hollingbery that the partnership was interested in buying approximately 150 bales of hops, and further testified:

"A. Mr. Reinemann asked Mr. Hollingbery, 'Who is this grower whose hops you're offering here on the second, on the second contract?' and so Mr. Hollingbery answered, 'the name is Anderson.' And Mr. Reinemann asked back—he said, 'Ralph Anderson in Wapato?' which Mr. Hollingbery confirmed, at which Mr. Reinemann told him, 'Well, we know Mr. Ralph Anderson and Ray Anderson, his brother; we have this first contract with them, after which this second is offered now.' Q. Was there a further conversation between Mr. Reinemann and Mr. Hollingbery in reference to what I might call the Anderson deal? A. Yes, there was.

Mr. Reinemann called Mr. —— Q. You may state it. A. Mr. Reinemann called Mr. Hollingbery's attention to it, that we knew the Andersons and had dealt with them before and had this 300-bale contract with them, and that it would be a question whether we can accept that second contract inasmuch as it was questionable whether the full amount of the total of 450 bales would be safe to be expected on the land in question. Q. You mean, safe—that is, that would be grown and delivered from those lands. A. Yes."

Mr. Hollingbery also testified as to that telephone conversation between Mr. Reinemann and himself, and, in so doing, corroborated, in every particular, Mr. Herman's version of it, just above quoted.

There is a wealth of evidence in the record, given by both growers and buyers of hops, to the effect that it is customary for hop buyers to contract prior to, or early in, the growing season, for an estimated quantity of hops to be grown on certain lands described in the instrument. In the trade, such a contract is called a production contract. It is also called a "first." It is understood by the parties to such a contract that a grower may make future contracts to sell hops if the lands involved produce an excess of the amount contracted for in the first contract. These excess amounts are known and spoken of in the trade as "overages," and contracts made to dispose of them are known as "2nds" (seconds).

As we have hitherto shown by quotations from Hollingbery's letter of June 21, 1947, he therein inquired of the plaintiff partnership whether it would be interested in buying, from a reliable grower on a "2nd," 150 bales of seedless 1947 crop, stating that he had an option from the grower for a few days. It is with the contract that finally resulted from that inquiry that we are concerned on this appeal. As we have also shown, before the plaintiff authorized Hollingbery to make the "2nd" contract for 150 bales, Walter Reinemann inquired of Hollingbery, in a telephone conversation, who the grower was, and Hollingbery replied, Ralph Anderson, whereupon Reinemann asked if he meant Ralph Anderson in Wapato, and Reinemann told him:

"Well, we know Mr. Ralph Anderson and Ray Anderson, his brother; we have this first contract with them, after which this second is offered now."

In this connection, Herman further testified:

"Mr. Reinemann called Mr. Hollingbery's attention to it, that we knew the Andersons and had dealt with them before and had this 300-bale contract with them."

So, there is no doubt but that the Andersons were contemplating a "2nd" contract covering hops to be raised upon the lands as to which the plaintiff already held the first contract. The Andersons wanted to contract to sell the overages, if any, and the plaintiff wished to contract for them. This was, at least, the primary object of the contract to be negotiated, as both the growers and the buyer, as well as their go-between, Mr. Hollingbery, well knew. Hollingbery, as he indicated in his letter to the plaintiff, was accustomed to draw up the contract in case he bought hops for a dealer. He did so in this case, and a contract was executed by the Andersons, or at least by Ralph and Ray Anderson, as of June 26, 1947, and copies sent to the plaintiff. The copies were returned to Hollingbery for some minor changes, principally because the description of one of the hop yards was omitted. Plaintiff called attention to the omission. Hollingbery then drew up another contract, including the omitted description but otherwise containing the same provisions. This contract was executed by Ralph and Ray Anderson and by their respective wives as of July 3, 1947, and is the contract which is alleged to have been breached by the Andersons.

The contract purported to be between the Andersons as sellers of hops and Paul Reinemann Company as purchasers thereof. We quote those portions of the contract which are pertinent to the principal point in issue, omitting the provisions as to price and other provisions which throw no light on the controversy:

"QUANTITY: Sellers agree to sell and Buyer agrees to buy 150 bales of hops of the year 1947 estimated at 30,000 lbs., as produced during 1947 upon the following described properties in Yakima County, Washington, to wit:

"40 acres more or less, in the Northeast quarter of the Southwest quarter of Section 2, Township 10 N., Range 18, E. W. M., and

"10 acres more or less, in the Northwest quarter of the Southeast quarter of Section 2, Township 10 N., Range 18, E. W. M.

*"These 150 bales of hops are to be supplied first from the above descriptioned land and/or other hops from crops grown or purchased by Sellers.*

"QUALITY: The hops delivered hereunder shall be seedless hops, with a seed content not in excess of 3% and a leaf and stem content not in excess of 4% both in weight. *Sellers agree that hops will be grown with care,* baled and prepared for market in a husbandlike manner. Hops shall be in sound condition, good and even color, fully matured but not over-ripe, cleanly picked, properly dried and cured, free from mould and sweepings, and carefully dusted or sprayed when necessary. Hops shall be in good and merchantable condition when delivered. . . .

"ADVANCES: *The Buyer agrees to advance to the Seller for growing and harvesting of such contracted hops:*

"Aug. 10 1947 25¢ per pound on estimated 30,000 lbs. $7,500.00.

"The advances on this crop are to be secured by a chattel mortgage from the Sellers to the Buyer representing second lien on the above described land, said chattel [mortgage] to be given at time of the first advance. It is understood that Buyer already has a chattel mortgage representing first and prior lien. . . .

"INSURANCE: Said hops shall be insured by the Sellers against loss by fire in the usual custom of hop insurance, protecting the interests of the Buyer as they may appear." (Italics ours.)

The controversy in this case is wholly over the interpretation to be given to the three-line paragraph which immediately follows the land descriptions.

On July 3, 1947, the same day that the contract was executed, the Andersons also executed a chattel mortgage to the Paul Reinemann Company, which read, in part, as follows:

"WITNESSETH: Whereas, On the 3rd day of July, 1947, the parties hereto entered into a written contract whereby the parties of the first part bargained and sold and agreed to de-

liver or cause to be raised and delivered to the party of the second part entire crop of hops during the years 1947, 19  , 19  , 19  , and 19  , growing and to be grown on the following described premises situate in Yakima County, State of Washington, to-wit:

"40 acres more or less, in the Northeast quarter of the Southwest quarter of Section 2, Township 10 N., Range 18, E. W. M., and

"10 acres more or less, in the Northwest quarter of the Southeast quarter of Section 2, Township 10 N., Range 18, E. W. M., as fully set forth in said contract, recorded in the office of the Auditor of Yakima County and said contract is hereby referred to and made a part hereof with like effect as if said contract was fully written out herein.

"Now THEREFORE, in consideration of the premises and the consideration of ONE DOLLAR ($1.00) in hand paid by the party of the second part to the parties of the first part, the receipt whereof is hereby acknowledged, and for the purpose of securing the faithful performance of all the terms and conditions of said contract to be done and performed by the parties of the first part for and during the year 1947, the parties of the first part do hereby mortgage to the party of the second part all of the hops growing or to be grown upon the described lands during the year 1947, to have and to hold the above mentioned and described crop subject to the provisions of said contract and to the provisions hereinafter contained, and it is distinctly understood and agreed that this mortgage is made to secure in addition to the performance of said contract the payment of all sums and amounts in which the parties of the first part are now indebted to the party of the second part and for such other indebtedness as they may incur for any reason during the life of this mortgage.

"*The parties of the first part agree that they will well and carefully tend, take care of and protect said crop while growing and until fit for harvest, and then without delay will properly harvest, pick, dry, cure and bale said hops and prepare the same for market, all in accordance with the terms of the contract hereinbefore referred to.*" (Italics ours.)

The recital in the mortgage, that is, that part of it, above quoted, which precedes the land descriptions, to the effect that, in the contract of July 3rd, the Andersons sold, and agreed to deliver, the "entire crop of hops during the year

1947, growing and to be grown" on the described premises, obviously cannot speak the truth, since the contract made on July 3, 1947, covered only 150 bales. It would have been true, however, to say that, after that contract was made, the Paul Reinemann Company had contracts for 450 bales, to be grown in 1947 by the Andersons on the lands described; for, on March 15, 1947, the Andersons had contracted to sell them 300 bales to be grown on the same lands during the 1947 season. That contract contained, among its many provisions, the following:

"IT IS HEREBY UNDERSTOOD AND AGREED that the seller does hereby agree to sell and the buyer does hereby agree to buy from the seller 60,000 pounds of baled hops to be grown by the seller upon the premises above described during the season of 1947, but if the seller produces over 60,000 pounds of baled hops on the above described premises, then and in that event, he shall have the right to sell and dispose of such quantity over 60,000 pounds to whomsoever he desires and deems advisable."

On July 3, 1947, therefore, the Andersons had the right to make the second contract to sell their overages, if any, and that is what the court found was their primary intention in making the July 3rd contract which is the subject matter of this action.

When the crops were harvested from the lands described in the plaintiff's first and second contracts with the defendants, it was found that the quantity was less than the 300 bales contracted for in the first contract; and, therefore, that there were no overages whatever to apply on the 150-bale "2nd" contract. Whereupon the plaintiff demanded that the defendants purchase 150 bales in the open market and deliver those bales to them. This demand was grounded upon the language of the second contract immediately following the descriptions therein:

"These 150 bales of hops are to be supplied first from the above descriptioned land and/or other hops from crops grown or purchased by Sellers."

The Andersons refused to purchase and deliver the 150 bales so demanded; in fact, they could not have done so

without violating the Washington statute commonly known as the commission merchants law (Rem. Rev. Stat. (Sup.) § 8292 *et seq.*), for they had not posted the bond or received the license required of persons who purchase agricultural products from the producer for resale. See *State v. Dillon,* 188 Wash. 265, 62 P. (2d) 38, a case in which the defendant was charged and convicted of having bought and resold chickens without filing a bond and taking out a license.

We have hereinbefore quoted the greater part of the contract of July 3, 1947. It was said, under the heading "Quantity":

"Sellers agree to sell and Buyer agrees to buy 150 bales of hops of the year 1947, . . . as produced during 1947 upon the following described properties in Yakima County, Washington, . . ."

Then follows a legal description of forty acres, more or less, followed by another ten acres, more or less, all located in Yakima county. That is immediately followed by the provision which is submitted for interpretation:

"These 150 bales of hops are to be supplied first from the above descriptioned land and/or other hops from crops grown or purchased by Sellers."

So, if we accept the appellant's present interpretation of the contract, we start out with an instrument which is self-contradictory; for, it is first stated that the seller agrees to sell, and the buyer agrees to buy, 150 bales of hops of the year 1947, produced on certain definitely described property, and, if the interpretation now insisted on by the appellant is correct, it is then provided that the 150 bales may be made up, if necessary, by delivering bales of hops not grown, but purchased, by the sellers.

The theory upon which this action was brought and tried by the plaintiff was that, if the defendants did not have 150 bales of overages, or crops grown on other lands, to enable them to deliver 150 bales of hops, they were obligated to buy sufficient hops on the open market to make up and deliver the 150 bales.

The theory of the defendants was that the contract did not obligate them to purchase any hops, and, if the contract is so construed, it is self-contradictory.

In the paragraph headed "Quantity," it is said:

"Sellers agree to sell and Buyer agrees to buy 150 bales of hops of the year 1947, . . . . , *as produced during 1947 upon the following described properties in Yakima County, Washington,* . . . " (Italics ours.)

That is followed by legal descriptions of the property, and that is followed by the three-line paragraph upon which the plaintiff based its claim that, in case the lands did not produce 150 bales, the sellers were obligated to buy a sufficient number of bales in the open market to make up the shortage.

Under the heading, "Quality," it is said, in part:

"Sellers agree that hops will be grown with care, baled and prepared for market in a husbandlike manner."

Obviously, the sellers could not make such an agreement as to hops which they might purchase on the open market.

The contract also provided that the buyer would make advances to the sellers "for growing and harvesting of such contracted hops," and further provided that a mortgage should be given to secure such advances. This, of course, indicates that the "contracted hops" were hops grown by the sellers. Surely, the plaintiff did not intend to make advances, secured by mortgages, on hops which the sellers might buy from some other crop grower in the future.

It is also provided under "Insurance":

"Said hops shall be insured by the Sellers against loss by fire in the usual custom of hop insurance, protecting the interests of the Buyer as they may appear."

What are "said hops"? Clearly, the sellers could not insure in advance some hops which they might or might not buy some months later.

The trial judge announced, early in the trial, that he thought the contract ambiguous, and that he would, therefore, freely receive testimony showing the circumstances under which the contract was made, and, in his oral opinion delivered at the close of the trial, said, among other things:

". . . although the court had opened the doors to the production of testimony showing the surrounding circumstances, at no time did Mr. Hollingbery state that there was any conversation whatsoever with reference, if there was a shortage, to the necessity of Mr. Anderson's going out on the open market and purchasing these hops. The evidence all shows that that is not a customary clause in any of these contracts whatsoever, and, in so far as this record is concerned, there wasn't any conversation between any of the parties to this contract with reference to the necessity of the seller's going out on the open market and purchasing hops, if there was a shortage.

"Now, then, the correspondence indicates that the plaintiff company did not have such a thing in mind at all. And I am not criticising. I was very impressed and intrigued with the testimony of Mr. Herman. I feel that he knows his business and is a learned and honorable man. There wasn't anything in his conduct or testimony which reflects in the least; he is merely presenting his theory of the provisions of this contract; and neither does the court find that there was any overreaching on the part of Mr. Hollingbery. The evidence does show that he had some correspondence with the plaintiff company in which they stated that they wanted 150 bales, but I don't think that Mr. Hollingbery drew the contract in such a way that would assure him 150 bales under this contract.

"Now, Exhibit 6 I was interested in when it was introduced in evidence. It is a letter from the plaintiff company to Mr. Hollingbery, and it is dated July 7th:

" 'We noted that on the Larue ranch (70 plus 11 acres) Steiner has a 600 bale contract; there, the proportion of acreage to volume of contract is better, i.e. safer than with our 450 bales on 50 acres; on the other hand, we can therefore expect that in case of a shortage under our contracts there will be enough overage on the Larue place to assure full delivery to us.'

[We may interpolate at this point that the evidence shows that the Andersons were growing hops on the Larue ranch and had given Steiner a 600-bale first contract on that acreage.]

"Creeping through the evidence throughout the case, there is the concept, gentlemen, and that is the court's conclusion, and I realize that one party cannot agree with me and they never can, that this is an overage contract.

"Mr. Anderson characterized the stupidity of entering in-

to such a contract as contended for by the plaintiff company when he was on the witness stand, stating that it would certainly be silly for him to enter into such a contract. I realize that he read the contract, but, in view of the fact that the contract was prepared by the plaintiff company, it is undoubtedly susceptible of two constructions. One construction was that, if he had bought hops, he would have to supply them, but there is nothing in the contract that makes it mandatory for him to buy them.

"I think the rational and reasonable interpretation leads to the conclusion that the plaintiffs' case must fail.

"There is one other element in the case. The evidence shows that Anderson is not a broker, that he doesn't have a license. If he did go out and purchase these hops for sale, it would be a violation of law, he would be committing a misdemeanor, and it is not reasonable to suppose that a contract would be entered into which would contemplate the commission of this misdemeanor. . . . But the court is not predicating its decision upon that feature of the case. It is basing it upon the other interpretation."

Appellant's counsel vigorously contends that the contract was in no way ambiguous, but clearly bound the respondents, if 150 bales were not furnished from the lands described in the contract or from other hops grown by the respondents, to buy, in the open market, and deliver, sufficient hops to make up the shortage. We agree with the trial court that there is nothing in the contract that made it mandatory on the respondents to buy hops to fill out the 150 bales.

Although it has not been suggested by the respondents, we are of the opinion that a permissible and far more justifiable interpretation than that insisted upon by appellant's attorney would be that the words "purchased by Sellers" simply gave the respondents, in case they could not deliver 150 bales of hops from the described lands, supplemented by hops grown by them on other lands, the option of making up the shortage by purchasing hops from other growers.

There is ample evidence in the record, much of which was given by disinterested witnesses, that Ralph Anderson, who acted for the respondents in dealing with Mr. Hollingbery, was very reluctant to enter into a second contract to supply

150 bales from the lands described in the contracts, for the reason that he doubted that there would be that much overage on the first contract named. He testified that, one day in early June, 1947, Hollingbery came to his ranch, and they had the following conversation:

"A. He said that he had an order for 150 bales of hops, and I told him that it was possible that I would have 150 bales but I didn't think that I would, if I had 100 I would be doing well; that's overages. Q. Yes. And what did he say to that? A. He said that he would try to contact somebody, to sell the hops. Q. As I understand it, you thought that your overage might not exceed 100 bales? A. That is, it's just guess that I could have had 150, but I didn't believe there would be."

Anderson further testified as follows:

"Q. Now, then, how long was it before you saw him again, and where did you see him? A. It was a couple of days later at my ranch again, and he said that the former deal had fell though, the deal he was working on— Q. Yes. A. —but he would try to sell the hops to someone else."

Presumably, Hollingbery then wrote the June 21st letter, introducing himself to the plaintiff partnership and inquiring whether it would be interested in making a second contract for 150 bales of seedless hops. Anderson further testified that, on June 26th, Hollingbery came to his home and handed him a written contract:

"A. I read the contract and signed it and I told him that there wouldn't be 150 bales, and he said that he wanted it large enough so that it would cover all of my crop over and above any hops—contracts that I had already made."

Anderson further testified:

"Q. Was there anything said on that occasion about what might be the situation if you didn't grow 150 bales of overages on any of these lands covered by contracts? A. I didn't get the question. (Last question read by the reporter.) Q. Did Mr. Hollingbery say anything to you; did he discuss that with you? A. He said it didn't make any difference if we didn't have 150 bales, that he just wanted it large enough so that, if I did have 150 bales, he would get them. Q. That is, do I understand you to mean that, after you told him that

you didn't think you would have 150 bales in excess of existing contracts, he then said that that didn't make any difference, he just wanted to make it large enough? A. That's right."

Mr. Randel Stovall of Toppenish was present when Hollingbery presented the draft of the June 26th contract to Anderson for execution. He testified, in part, as follows:

"A. Well, Mr. Anderson sat on the davenport, and placed the contract on the coffee table and started reading it. Q. Yes. A. And, when he got down to the clause where it said 150 bales, he spoke up and said, 'Babe, I don't think there will be 150 bales.' Q. Where were you sitting when he made that remark? A. Just right across the room; just right next to Mr. Hollingbery. Q. Were you watching him read the contract? A. That's right. Q. Watching Anderson read the contract? A. That's right. Q. And he told Mr. Hollingbery at that time that he didn't think there would be 150 bales? A. That's right. Q. Did he say anything else about what amount he would have? A. He said he thought there would probably be a hundred bales. Q. What did Mr. Hollingbery say at that time? A. He said it didn't make any difference, he wanted to have the contract large enough so it covered the overages above the existing contracts they then had. Q. He said he wanted it to be large enough so it would cover any— A. Any and all hops over and above his existing contracts. Q. Any and all hops over and above his existing contracts; I see. Did I understand you to say that Ralph said he probably would have or approximately would have a hundred bales of overages; is that right? A. That's right."

Mr. Clarence H. Hale was also present. Hale testified, in part, as follows:

"Q. Then did Mr. Anderson take the contract? What did he do with it? A. Well, there was a coffee table in front of him. He was sitting on the davenport and he put it on the coffee table and started to read. Q. After he had read it or while he was reading it, did Mr. Anderson say anything to Mr. Hollingbery. A. Yes. He read down— He read the contract, part of it, until he came to where it said 150 bales, and he said, 'Babe, I don't think there will be 150, it might be a hundred.' Q. Do you recall that distinctly? A. Yes. Q. What did Mr. Hollingbery say? A. Well, he said it

wouldn't make any difference, he wanted to make it big enough to cover what overages above the existing contracts."

Ruth Anderson, Ralph Anderson's wife, was also present when the June 26th contract was presented to her husband. She testified, in part, as follows:

"Q. Did you see him deliver anything to Ralph? A. Yes. Q. And did you hear him say anything to Ralph about it, what it was? A. Yes. Q. What did he say? A. He asked if Ralph could sign the contract then, or he had brought the contract up for Ralph to sign. Q. Now, just tell the court, then, what happened. A. Well, Ralph was sitting on the davenport and I believe he explained to Mr. Hollingbery that he was going to leave on the afternoon plane, and he started to read the contract and he said, 'Well, Babe, I don't think there will be 150 bales.' Q. What did Mr. Hollingbery say? A. He said—I believe he said—I don't know the exact words, but I believe he said, 'It doesn't make any difference, we want to make it big enough.' Q. And did Ralph sign it at that time? A. Yes."

It would seem very unlikely that Ralph Anderson, while expecting that his overages would not exceed 100 bales, would bind himself and his associates to buy a sufficient number of bales to fulfill a 150-bale contract.

The demand that the respondents purchase hops for delivery to plaintiff was first made by Walter Reinemann on or about the 10th day of September, 1947. But, in our opinion, Walter Reinemann, while acting for the plaintiff partnership, much earlier signified that he did not expect the respondents to purchase hops for delivery in case of a shortage. Refer to the statement included in his letter to Hollingbery of July 7, 1947, which statement the trial judge quoted in that portion of his oral opinion which we have hereinbefore quoted.

The contract in suit was executed by the Andersons on July 3, 1947. Hollingbery immediately sent several duplicate copies to the plaintiff for its execution. They were executed and returned to Hollingbery by letter of July 7th, signed by Walter Reinemann. In this letter, he expressed some anxiety as to whether the Andersons would grow suf-

ficient hops to fulfill their contracts on the lands described therein, but reassured himself by saying:

" . . . we can therefore expect that in case of a shortage under our contracts there will be enough overage on the Larue place to assure full delivery to us."

In so saying, he was interpreting the language of the contract which we are now called upon to interpret. In view of the fact that the result of this appeal depends upon the interpretation of the shortest paragraph in the complaint, we again requote it:

"These 150 bales of hops are to be supplied first from the above descriptioned land and/or other hops from crops grown or purchased by Sellers."

So, within a day or two after receiving and executing the 150-bale contract, the plaintiff says, through Walter Reinemann, one of the partners: In case of a shortage under our contracts covering the hops growing on the lands therein described, we can expect that the Andersons will have enough overage from hops grown by the sellers on other lands (the 81-acre Larue ranch); that is, he should then expect the shortage, if any, to be made up, not by purchase of hops in the open market by the Andersons, but by delivery of overages from the Larue ranch. In speculating as to what would be done if there was not sufficient overage from the described lands to make up 150 bales, he indicated that he expected that the shortage would be made up by overage from the Larue ranch, and he in no way indicated that, if that failed, the Andersons would be bound to make up the shortage by buying hops from other growers.

The trial judge concluded as a matter of law that the part of the contract relating to the purchase of hops, other than those grown and produced by defendants, is ambiguous, and, when construed, means that it was not the intention of the parties that the defendants would be required or obligated to purchase hops to fulfill the contract in the event they did not grow or produce crops with which to do so in whole or in part.

On June 30, 1948, the court entered the following judgment:

"It Is Ordered and Adjudged that the above entitled action be and the same is hereby dismissed with prejudice and that the defendants have judgment against the plaintiffs for their costs and disbursements as the same shall be taxed."

The plaintiff immediately gave notice of appeal, and the appeal was in due course perfected.

We are of the opinion that the trial court made a sound and legally proper disposition of the cause. Accordingly, the judgment appealed from will stand affirmed. It is so ordered.

Mallery and Hamley, JJ., concur.

Simpson, C. J., dissents.

Schwellenbach, J. (concurring)—Looking at the contract in its entirety, it starts out as an agreement to sell one hundred fifty bales of hops of the year 1947 upon certain described properties in Yakima county. The contract then states that the one hundred fifty bales are to be supplied first from the land described and/or other hops from crops grown or purchased by sellers. The sellers agreed that the hops would be grown "with care." There was also a provision for an advancement of twenty-five cents per pound "for growing and harvesting of such contracted hops."

Taking the instrument by its four corners, I cannot find a binding obligation to go out into the market and purchase hops sufficient to deliver one hundred fifty bales to the buyer. The provisions of the contract appear to be in conflict with each other. The agreement is ambiguous. It became the duty of the trial court to take testimony, not for the purpose of making a new contract for the parties, but to place itself in the position of the parties when the contract was drawn, and thus determine what they actually agreed to do.

Beals, J., concurs with Schwellenbach, J.

HILL, J. (dissenting)—If the contract in this case is ambiguous, the evidence which the majority opinion sets forth in considerable detail amply supports the conclusion of the trial judge and the majority as to what the parties actually intended.

However, it seems to me to have required considerable effort to find the ambiguity in the three lines of the contract frequently referred to in the majority opinion or in the contract as a whole. Personally, I lack the ingenuity to find the ambiguity, and hence I see no reason to apply any rules of interpretation or to admit any evidence as to the intentions and purposes of the parties. We have consistently held that we cannot, upon general considerations of abstract justice, make a contract for the parties that they did not make for themselves. *Chaffee v. Chaffee*, 19 Wn. (2d) 607, 145 P. (2d) 244; *Merlin v. Rodine*, 32 Wn. (2d) 757, 203 P. (2d) 683.

DONWORTH, J. (dissenting)—The contract involved in this case seems to me to be unambiguous. If, as contended by respondents, the instrument did not express the true intent of the parties, they should have sought to have it reformed to conform therewith. No such relief having been applied for, I concur with Judge Hill that there was no legal basis for the admission of evidence by the trial court with respect to the intentions and purposes of the parties. I think that the judgment of dismissal should be reversed.