[No. 2316–3.   Division Three.   November 7, 1978.]

RAY COLLEY, *Appellant*, v. BI–STATE, INC.,
*Respondent*.

*Critchlow, Williams, Ryals & Schuster, Edward B. Critchlow,* and *Richard M. Knoeber,* for appellant.

*Butler, Cowan & Wolcott* and *P. Craig Walker,* for respondent.

GREEN, J.—Ray Colley sued Bi–State, Inc., for payment for 5,235.03 bushels of wheat which he sold and delivered to Bi–State in July and August 1974. Bi–State counterclaimed for damages for Mr. Colley's failure to deliver the remaining 19,764.97 bushels allegedly due under two contracts. From a judgment in favor of Bi–State for $2,528.97, both parties appeal.

Two questions are presented: (1) Do the provisions of either RCW 62A.2–613 relating to casualty to identified goods or RCW 62A.2–615 relating to commercial impracticability excuse Mr. Colley's performance? and (2) Did the trial court err when it found that August 25, 1974, was the date Bi–State learned of Mr. Colley's breach?

Ray Colley is an experienced wheat farmer. In the spring of 1974, he had approximately 1,200 acres planted in dry land wheat near Badger Mountain in the Tri–Cities area. This acreage had previously yielded Mr. Colley only 13 bushels per acre, but crop conditions in April 1974 caused him to believe that the yield that year would be much higher. Because Mr. Colley was concerned that the current high wheat prices would drop before it was time to harvest his crop, he entered into two contracts with Bi–State, Inc., a grain dealer in Kennewick, for the sale of 25,000 bushels of wheat to be delivered in July or August. Bi–State's representative in these negotiations was Dell Smick. Mr. Smick

and Mr. Colley had known each other for 20 years and had contracted for the sale of wheat on several prior occasions.

In the first contract, dated April 24, 1974, Mr. Colley promised to deliver 15,000 bushels to Bi–State for $4.10 per bushel. On April 26 he entered into a second contract to deliver an additional 10,000 bushels at $4.05 per bushel. Neither contract expressly required Mr. Colley to grow the wheat himself or to grow it in any particular location. In reliance on these two contracts, Mr. Smick committed Bi–State to sell 25,000 bushels to an exporter, United Grain Corporation.

June 1974 was particularly hot and dry. In early July, Mr. Colley notified Mr. Smick that, as a result of the weather conditions, he was going to be short of wheat. Mr. Colley completed his harvest in late August and delivered his total yield to Bi–State. The yield was approximately 20,000 bushels less than that he had promised, so he told Mr. Smick that he would attempt to cover the deficit by purchasing "black market" wheat in Montana. Mr. Smick agreed to an extension but, in the meantime, bought back the 10,000–bushel contract from his exporter at $5.28 per bushel and purchased other grain in order to meet his commitment under the first contract. According to Mr. Smick, Mr. Colley did not advise him until the first of October that he would be unable to perform his contract.

First, Mr. Colley contends that RCW 62A.2–613 and RCW 62A.2–615 excused his performance of the contracts. RCW 62A.2–613 excuses a seller's performance in whole or in part "[w]here the contract requires for its performance goods *identified*[1] when the contract is made, and the goods suffer casualty without fault of either party before

---

[1]RCW 62A.2–501 states:

"(1) . . . In the absence of explicit agreement identification occurs

"(a) when the contract is made if it is for the sale of goods already existing and identified;

". . .

"(c) when the crops are planted or otherwise become growing crops . . . if the contract is . . . for the sale of crops to be harvested within twelve months or the next normal harvest season after contracting whichever is longer."

the risk of loss passes to the buyer". (Italics ours.) RCW 62A.2–615 provides that:

> *Except so far as the seller may have assumed a greater obligation* . . .
> (a) Delay in delivery or non–delivery, in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if *performance as agreed* has been made impracticable by the occurrence of a contingency, the nonoccurrence of which was a basic assumption on which the contract was made . . .

(Italics ours.)

Mr. Colley asserts that his wheat crop was damaged by the dry June weather of 1974, and therefore, his performance was excused under both of these statutes. The trial court never reached the question of what caused the reduced yield. Instead, it found that the parties' written agreements, as supplemented by evidence of trade usage, did not limit Mr. Colley's performance to the sale of wheat grown on his 1,200 acres. This finding is supported by substantial evidence. Since RCW 62A.2–613 requires that the damaged goods be *identified* goods and since RCW 62A.2–615 requires that the *"performance as agreed"* (italics ours) be impracticable, the court concluded that the two sections were not applicable. We agree.

The cases interpreting sections 2–613 and 2–615 of the Uniform Commercial Code are few in number. *See, e.g., Eastern Airlines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957 (5th Cir. 1976); *Ralston Purina Co. v. McNabb,* 381 F. Supp. 181 (W.D. Tenn. 1974); *Mishara Constr. Co. v. Transit–Mixed Concrete Corp.,* 365 Mass. 122, 310 N.E.2d 363 (1974); *American Oil Co. v. Columbia Oil Co.,* 88 Wn.2d 835, 567 P.2d 637 (1977). We have not found any case which deals with the particular question presented here, *i.e.,* how does evidence of trade usage affect the applicability of these two sections? However, this question is answered by the reference to the code itself. Section 2–613 applies only where the continuing existence of identified goods is a presupposition of the agreement; section 2–

615 applies only where the parties by their agreement have not assumed any greater liability. Thus, the court must analyze the terms of the contract before it can decide whether either section is applicable. By statute, these terms may be construed or supplemented by evidence of trade usage, course of dealing, and course of performance, as well as evidence of consistent additional terms. RCW 62A.2–202;[2] RCWA 62A.2–615, comment 8.[3] RCW 62A.2–105(2) defines "usage of trade" as:

> [A]ny practice or method of dealing having such regularity of observance . . . as to justify an expectation that it will be observed with respect to the transaction in question.

Whether the offering party has produced sufficient evidence to establish a trade usage as part of the contract is a question of fact. RCW 62A.1–205(2).[4]

Here, the agreement was supplemented by evidence of trade usage that parties to this type of agreement intend to be bound regardless of the success of the seller's crop. While Mr. Smick testified that he felt Mr. Colley probably was selling the wheat he planned to harvest from his farm, this feeling, in light of existing custom and trade usage, is

---

[2]RCW 62A.2–202 provides that:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(a) by course of dealing or usage of trade (RCW 62A.1–205) or by course of performance (RCW 62A.1–208); and

"(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

[3]Comment 8 of RCWA 62A.2–615 reads:

"The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like."

[4]RCW 62A.1–205(2) provides, in part:

"The existence and scope of such a usage are to be proved as facts."

not sufficient to support an implication that the parties intended to limit the sale to such wheat. Here, uncontradicted testimony of area farmers and local grain dealers was that under existing custom and trade usage, such agreements were never contingent upon the success of the seller's crop. Mr. Smick stated that he would not agree to buy wheat grown on specified property; to do so would jeopardize his ability to meet his commitments to his exporters. Further, Mr. Colley admitted that he felt an obligation under the contracts even after it became apparent that he could not perform using only the wheat from his property. This sense of obligation is what prompted him to suggest that Mr. Smick give him an extension so that he might look into buying "black market" wheat. In these circumstances, the trial court was correct in holding that Mr. Colley's performance was not excused by the failure of his crop.[5]

Mr. Colley's reference to RCW 20.01, which provides for the licensing and supervision of persons dealing in grain other than as a producer or grower, does not alter our holding. According to Mr. Colley, he could not have contracted to sell grain in excess of that which he grew on his own property because he had no license and, therefore, no legal means of obtaining additional grain. Consequently, he argues that the contracts should be limited to grain grown on his farm. We disagree. At the time of contracting, Mr. Colley believed that he could fulfill his agreements with grain produced on his own property. He gambled that

[5]*Snipes Mountain Co. v. Benz Bros. & Co.*, 162 Wash. 334, 298 P. 714, 74 A.L.R. 1287 (1931); and *Reinemann v. Anderson*, 34 Wn.2d 809, 210 P.2d 394 (1949), relied upon by Mr. Colley, are distinguishable. In *Snipes*, the court reformed the parties' unconditional agreement to show that the sale was to be made from produce growing on a particular parcel of land. In doing so, it relied on the fact that the buyer visited the seller's farm during negotiations and prior to signing a written contract. No such visit occurred in the present case. Furthermore, in *Snipes* there was no evidence of trade usage as was here. In *Reinemann*, the contract explicitly stated that the crop which was the subject of the sale was to be grown upon certain property. The court refused to construe another section of the agreement in a manner which would contradict this provision. In contrast, the Colley/Bi–State contracts did not contain a provision limiting the sale to wheat grown on Mr. Colley's property.

wheat prices would drop and that he would harvest a bumper crop. He lost on both counts. RCW 20.01 does not change his liability for nonperformance. It merely limits the methods by which he can avoid a breach.

Second, Bi–State contends that the trial court erred (1) in finding that it learned of the breach on August 25, 1974, the date Mr. Colley delivered the last of his harvest to the Bi–State elevators, and (2) in calculating damages on the basis of $5.28 per bushel, the fair–market value of wheat on August 26. RCW 62A.2–713 provides:

> [T]he measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price . . .

Bi–State argues that on August 25, it only knew that Mr. Colley would be unable to fulfill the balance of his obligation with wheat from his own harvest. However, Mr. Colley still hoped to meet his contract duties with wheat from other sources, and Bi–State granted his request for an extension. According to Mr. Smick, it was not until about October 1 that Bi–State realized that Mr. Colley would be unable to perform at all. Bi–State argues that damages, therefore, should be calculated on the basis of the fair–market value of wheat on that date.

This argument presents a question of fact. The record reveals substantial evidence in support of the trial court's choice of August 25, 1974, as the date Bi–State learned of Mr. Colley's breach. Prior to that date, Bi–State was aware that Mr. Colley was going to be short of wheat, but it was not until August 25 that it realized the extent of the breach. At that time, Mr. Smick, an experienced grain broker, should have known that Mr. Colley's plan to buy "black market" wheat at a low figure was unrealistic in light of the rapidly rising prices. In fact, he did not rely on the extension. He immediately bought back the second contract from his exporter and covered the first contract over the next few weeks by purchasing additional grain from other farmers. Mr. Smick's testimony supports the

trial court's holding that August 25 was the day he learned of the breach:

Q. Well, you were covering yourself in August, that's correct, isn't it?
A. Yes.
Q. And you knew he wasn't going to deliver?
A. Yes. The records are right and our negotiations are correct. This purchase was made the day after Mr. Colley told me he couldn't find—he came in and said "I have two loads left, and it looks like we will have a little over 5000 bushels." *Of course, that put the fear in me. I knew then where he stood, so I wanted to get covered. I had a feeling about the price.*

(Italics ours.)

Affirmed.

MUNSON, C.J., and ROE, J., concur.

Reconsideration denied December 5, 1978.